Oleg Elkhunovich (269238)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Telephone: (310) 789-3193
Facsimile: (310) 789-3150
oelkhunovich@susmangodfrey.com

James T. Southwick (pro hac vice to be filed)
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Facsimile:  (713) 654-6666
jsouthwick@susmangodfrey.com

Steven F. Benz (pro hac vice to be filed)
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
sbenz@kellogghansen.com

*Attorneys for Plaintiff Veeva Systems Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **VEEVA SYSTEMS INC.,**<br><br>       **Plaintiff,**<br><br>**vs.**<br><br>**IQVIA INC. and IMS SOFTWARE SERVICES, LTD.,**<br><br>       **Defendants.** | **Case No.**<br><br>**VEEVA SYSTEMS INC.'S COMPLAINT** |

Case No.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1.      Plaintiff Veeva Systems Inc. ("Veeva") alleges against Defendants IQVIA Inc. and IMS Software Services, Ltd. (collectively, "Defendants" or "IQVIA") as follows:

**INTRODUCTION**

2.      This action addresses IQVIA's abuse of its monopoly power in the markets for life sciences reference data and sales data ("Reference Data" and "Sales Data," respectively). IQVIA exploits its Reference Data and Sales Data monopolies to maintain or enhance those monopolies, and to expand its market power into the life sciences commercial data warehouse ("CDW") market. IQVIA does so by blocking Veeva from providing competing software and data products to life sciences companies.

3.      IQVIA has long dominated the Reference Data market. Major life sciences companies, including pharmaceutical and biotech firms, pay IQVIA to license its data products. IQVIA also offers software products life sciences companies.

4.      Veeva is a software company that provides a suite of software products tailored to the life sciences industry. For instance, Veeva offers CDW software ("Veeva Nitro"), artificial intelligence software ("Andi"), customer relationship management software ("Veeva CRM"), and master data management software ("Veeva Network"). Veeva's customers include the same major life sciences companies that license IQVIA's data.

5.      In the past decade, Veeva began to offer its own Reference Data product ("Veeva OpenData") to life sciences companies in direct competition with IQVIA. IQVIA responded with a campaign of anticompetitive conduct designed to hinder Veeva from offering Veeva Network and Veeva OpenData to life sciences companies.

6.      In the life sciences industry, data and software are interdependent. One is useless without the other. IQVIA leverages its data product license agreements with life sciences customers to block those paying customers from using IQVIA's Reference Data and Sales Data with Veeva software. IQVIA monopolizes Reference Data and Sales Data, both of which are essentially useless

without software. IQVIA's license agreements thus eliminate (or seriously dilute) the utility customers can obtain from Veeva software.

7.     IQVIA's longstanding practice has been to require life sciences customers to obtain a Third Party Access ("TPA") agreement before hosting IQVIA data on third-party software platforms, like Veeva's. Customers must request a TPA authorizing them to use IQVIA Reference Data and Sales Data with their preferred software.

8.     To prevent customers from using Veeva's competitive software and Reference Data, IQVIA intentionally delays and then flatly refuses to enter into TPA agreements requested by customers. Without a signed TPA agreement, life sciences companies cannot use the IQVIA data for which they paid in Veeva software. IQVIA has most recently been targeting Veeva Nitro.

9.     IQVIA's goal is to prevent competition in the life sciences software and data markets. And IQVIA's conduct has had the desired effect. IQVIA's conduct harms its customers, harms Veeva, and harms competition. IQVIA can engage in this conduct only because it has market power in Reference Data and Sales Data.

10.     IQVIA's refusals to allow life sciences companies to use IQVIA's data products with Veeva's software has no legitimate business justification. IQVIA's purported justifications are pretextual.

11.     IQVIA has harmed competition by preventing Veeva from providing its software and Reference Data to life sciences companies. IQVIA's conduct, designed to prevent Veeva from offering OpenData and software solutions, harms life sciences companies and competition by raising costs and reducing choice in the Reference Data and CDW markets, among others.

12.     IQVIA's exclusionary conduct injures life sciences companies by forcing them to pay higher prices, for inferior products, and with fewer choices. Life sciences companies often have no effective option except to contract with IQVIA despite their dissatisfaction with IQVIA's data products, software solutions, services, and prices.

Case No.

13.     Veeva seeks the damages it has suffered from IQVIA's anticompetitive conduct. Veeva also seeks a permanent injunction preventing IQVIA from continuing its abuse of monopoly power in the markets for Reference Data and Sales Data.

**THE PARTIES**

*Veeva*

14.     Plaintiff Veeva is a publicly traded information and technology services company, organized and existing under the laws of the State of Delaware, with its principal place of business at 4280 Hacienda Drive, Pleasanton, California 94588.

15.     Founded in 2007, Veeva rapidly has grown from a Silicon Valley startup to a leading global provider of industry-specific, cloud-based software solutions for the life sciences industry. Veeva's customers include many of the world's largest life sciences companies.

16.     Veeva provides cloud-based solutions for Reference Data, CDW, life sciences customer relationship management ("CRM"), enterprise content management, life sciences master data management software ("MDM"), and artificial intelligence. Life sciences companies rely on Veeva's products to realize the benefits of modern cloud-based architectures and mobile applications for their most critical business functions. Veeva's products provide industry-specific functionality and facilitate regulatory compliance efforts.

17.     Veeva OpenData is Veeva's proprietary Reference Data product. OpenData includes comprehensive information about healthcare professionals and healthcare organizations, and supplemental data that can be used with Veeva or third-party software solutions. Veeva has offered OpenData since 2013.

18.     Veeva CRM software offers industry-specific functions such as drug sample tracking with electronic signature capture, healthcare affiliations management, and the ability to conduct interactive, rich media demonstrations with physicians on a mobile device, with or without an internet connection. Veeva's CRM software enables customers to increase productivity and ensure regulatory compliance.

19.     Veeva Nitro is a leading-edge CDW software platform. Life sciences companies use Veeva Nitro to store and organize Reference Data and Sales Data (among other data), perform analytics and generate business insights. Veeva Nitro eliminates burden of customizing traditional CDW applications. It features an industry-specific data model and streamlined data connectors, which allow life sciences companies to unify their most important data sources.

20.     Veeva Andi is an artificial intelligence application that embeds tailored insights and suggestions in Veeva CRM for intelligent customer engagement. Veeva Andi enables a better CRM experience by discovering relevant customer insights and proactively suggesting the next best action for improved effectiveness.

21.     Veeva Network is Veeva's MDM software platform, which enables life sciences companies to create, consolidate, maintain, steward, and share data that drives life sciences companies' sales and marketing operations. Veeva Network manages complex healthcare provider, healthcare organization, and healthcare product data, and the relationships within and across those data domains.

22.     As a recent entrant into the life sciences technology space, Veeva focuses on innovation and adding value for customers. Veeva is thus a disruptive competitive influence on incumbent firms. Veeva's technology solutions have consistently demonstrated that legacy solutions cannot satisfy life sciences companies. Veeva's innovations directly benefit customers by helping to reduce total cost of ownership for technology solutions, expediting drug development processes, sharpening analytical insights, and easing regulatory compliance.

*IQVIA*

23.     Defendant IQVIA is the world's largest pharmaceutical data and analytics company. IQVIA seized its dominant position by absorbing competitors. For example, in 2015, IQVIA acquired the data, MDM, and CRM businesses of Cegedim, its main competitor. With this Cegedim acquisition, IQVIA annexed the leading life sciences Reference Data product in the European Union. IQVIA thus consolidated its status as the global leader in Reference Data with its already world-leading status in Sales Data.

24.     Defendant IQVIA is organized and existing under the laws of the State of Delaware with dual corporate headquarters at 83 Wooster Heights Road, Danbury, Connecticut 06180, and 4820 Emperor Boulevard, Durham, North Carolina 27703. IQVIA has offices at 435 Market Street, 7th Floor, San Francisco, California 94105, and 2200 Bridge Parkway, #102, San Mateo, California 94065, and is registered to do business in the State of California. IQVIA conducts a significant portion of its business in California, and/or derives substantial revenue from services rendered within the Northern District of California.

25.     Defendant IMS Software Services, Ltd. is a corporation organized and existing under the laws of the State of Delaware with headquarters at 83 Wooster Heights Road, Danbury, Connecticut 06810.

26.     IQVIA and Veeva compete in Reference Data, CDW, MDM, CRM, and artificial intelligence software.

## JURISDICTION

27.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1337 (commerce and antitrust regulation) and 1331 (federal question jurisdiction), as this action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and §§ 3, 4, and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15(a), and 26.

28.     This Court has supplemental jurisdiction to adjudicate the related state law claims under 28 U.S.C. § 1367.

29.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (c), and as provided in §§4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22.

## FACTUAL BACKGROUND

**Industry Background**

30.     IQVIA and Veeva both license Reference Data to life sciences companies. Both companies also license software products that enable life sciences companies to harness Reference Data and Sales Data, including CDW, MDM, and CRM offerings. IQVIA and Veeva sell data and software worldwide.

5

31.     The proliferation of advanced drugs has enhanced health and well-being worldwide. Accordingly, life sciences companies have become a cornerstone of the world economy, as people live longer and expect better care.

32.     Demand for new and better drugs has increased. Life sciences has developed into one of the world's largest, most complex, and most innovative sectors. And of course, life sciences companies compete fiercely. Even a marginal advantage can generate billions of dollars in revenue.

33.     The government pervasively regulates the life sciences industry. Consequently, as life sciences companies distribute and sell products, pharmacies, healthcare institutions, and customers generate enormous volumes of Reference Data and Sales Data. Life sciences companies need that data for commercial and regulatory compliance purposes. Yet they typically do not have the in-house expertise and technology to collect, analyze, validate, maintain, and update such vast datasets without third-party software platforms.

34.     Life sciences data providers like IQVIA and Veeva provide data to life sciences companies through subscription license arrangements. Because the underlying information changes regularly, subscription licenses purchased by life sciences companies typically include updates to the databases to ensure that they remain accurate and compliant.

35.     IQVIA's standard Licensing and Services Agreement gives IQVIA complete discretion to block its paying customers from using IQVIA's data products with customers' chosen software platforms. When IQVIA leverages its discretion by denying or delaying TPA agreements, it harms competition by restricting the range of third-party software platforms from which customers may choose. IQVIA is able to harm competition through discretionary TPA decisions only because it wields market power in Reference Data and Sales Data.

36.     TPA agreements govern customers' use of licensed data products. A life sciences company cannot use IQVIA data on a third-party software platform without a signed TPA agreement. The parties to the TPAs are the data provider (such as IQVIA), the third parties that provide software and services to the life sciences customer (such as Veeva), and the life sciences customers themselves who seek to use the data with the third-party application. TPAs set out the

Case No.

terms under which third parties (including providers of CDW, MDM, and CRM) may access data for the benefit of the life sciences customer.

37.     Typically, the life sciences company requests the TPA from the data provider, which provides the TPA to the software solution provider. In nearly all circumstances, the data provider and software provider unceremoniously sign the TPA for the benefit of their mutual customer. Before Veeva's entry into the CDW, MDM, and Reference Data markets, including when IQVIA and Veeva have executed TPAs for Veeva CRM, the TPA process typically took less than two weeks. It was routine.

38.     Data suppliers such as IQVIA typically use a form TPA that specifies the purposes for which the software provider may use the data for the benefit of the life sciences customer. For instance, a TPA can specify that data may be used in a CRM solution but not in an MDM solution. TPAs also govern confidentiality, access rights, and audit rights. IQVIA has used form TPAs since at least 2007.

### *Reference Data*

39.     Reference Data is information regarding doctors, hospitals, and other medical professionals and organizations. Reference Data generally includes the names and contact information for professionals as well as complex, overlapping affiliations of those professionals to clinics, hospitals, and other organizations. Building a dataset of this type requires using computer algorithms to compile and match information from various public sources, compiling information through licensing of private sources, and collecting information manually.

40.     Life sciences companies worldwide buy and rely on such information for sales, marketing, and compliance. In light of ferocious competition in the global life sciences industry, companies have come to rely on this data as mission critical. These companies generally gain access to reference data on a subscription basis, relying on suppliers such as Veeva and IQVIA to obtain, validate, and maintain the data.

41.     Data providers must continually validate Reference Data. Real-world facts constantly change: doctors retire, move offices, change employers, or change hospital affiliations.

Healthcare organizations change names or practice areas. As a result of this constant churn, almost one-fifth of all records will have some change each year, and an entire database may be effectively out of date in five years.

42. Reference Data is critical to sales and marketing. Even a small error rate or discontinuity of access to updated Reference Data can cost millions of dollars in lost revenue as well as potential fines or penalties for regulatory noncompliance.

43. IQVIA is a global monopolist in Reference Data under its OneKey brand. Upon information and belief, IQVIA maintains at least a 70% market share of the global Reference Data market.

44. Building a commercially viable Reference Data set requires extensive time and capital, creating barriers to entry. Further, since customers assist in notifying a provider of out-of-date data, established providers leverage their customer bases, erecting further entry barriers.

45. The Reference Data market is global in scope. While IQVIA and Veeva compete for sales of Reference Data worldwide, Reference Data is region and country specific.

46. IQVIA and Veeva sell Reference Data worldwide. Their customers buy Reference Data on a global basis. When deciding which Reference Data product to consume, customers consider vendors' geographic reach. A vendor's ability to offer Reference Data worldwide is a competitive advantage because it enables customers to contract with only one global vendor (as opposed to multiple national or regional vendors), and to maintain consistent Reference Data across global operations.

47. On a per-record basis, the price of Veeva's OpenData product is identical across the world.

48. IQVIA has stated publicly that the Reference Data market is global. For example, on its website, IQVIA advertises that its Reference Data product "OneKey is a trusted data source for HCPs and HCOs worldwide." IQVIA has also explained its "OneKey solution" is "a global reference data" product and "a significant global, and frankly the gold standard, if you will, in reference data." IQVIA has said that OneKey provides "names, addresses, specialties, affiliations,

8

[and] locations of all the stakeholders in healthcare on a global basis." IQVIA has described OneKey as its "widely used reference database that tracks more than 15 million healthcare professionals in approximately 100 countries, providing a comprehensive view of health care practitioners that is critical for the commercial success of our clients' marketing and sales initiatives." IQVIA employs Global Key Account Managers to manage global customer relationships.

49.    IQVIA has stated publicly that it performs data processing and data management activities in "global delivery centers." IQVIA has stated that "[i]n Madrid, Spain, [IQVIA] experts code and manage core reference data worldwide." IQVIA's "business activities are concentrated into global or regional hubs in one or more geographic areas" with "standardizing and cleaning of data in Manila, The Philippines" and "reference data management in Santiago, Chile."

50.    The Veeva and IQVIA executives in charge of the companies' respective Reference Data products have the word "global" in their titles.

51.    In the alternative, Reference Data is defined by national markets, and IQVIA's anticompetitive conduct in those markets has a direct, substantial, and reasonably foreseeable effect on Veeva in the United States.

### Sales Data

52.    Sales Data is a distinct data product derived generally from pharmaceutical prescription and sales activities. Whereas Reference Data contains contact and biographical information about healthcare professionals and organizations, Sales Data tracks the actual prescriptions written and volumes of drugs sold in a given geographic region. Life sciences companies use Sales Data both in planning and marketing.

53.    IQVIA possesses a Sales Data monopoly and sells its Sales Data to major life sciences companies.

54.    Sales Data enables life sciences companies to monitor and analyze their products' performance with a view to improving sales and marketing. Sales Data also underlies sales

Case No.

representatives' compensation. Sales Data relates to both prescription and over-the-counter drugs and healthcare products.

55.     IQVIA markets various types of Sales Data under different trade names. One product, known as DDD or DD Outlet, represents actual flow of prescription drugs at retail (*e.g.*, pharmacies) and non-retail (*e.g.*, hospitals) outlets.

56.     Another sales data product, known as Xponent, is prescription data that identifies the total number of prescriptions written in a therapeutic class. Xponent shows the number of prescriptions written for a drug by region or doctor but does not quantify sales by dollar amounts or number of doses.

57.     Building a marketable Sales Data set poses substantial hurdles. A market entrant must spend millions of dollars per year in fixed data acquisition costs and operate for years to offer a competitive product. Sales Data is subject to sweeping, shifting regulations, compliance with which raises costs for data providers. Sales Data providers also face the risk of civil and enforcement liability for regulatory noncompliance. These factors and others create barriers to entry that protect incumbent firms.

58.     Regulations require data providers to partially anonymize Sales Data. That process renders the final dataset difficult to use on its own. But when customers pair Sales Data with analytics software and detailed Reference Data, the Sales Data becomes immensely valuable to life sciences companies, which use it for analytics and marketing.

59.     IQVIA's worldwide market dominance led the European Commission, in connection with approving IQVIA's purchase of Cegedim, to require IQVIA to make its regional anonymized data segments, known as "Bricks," available to competitors. The European Commission recognized that "the overwhelming majority of pharmaceutical companies buy and use IQVIA's sales tracking data."

60.     IQVIA has a monopoly over Sales Data in the United States, holding at least an 80% market share.  IQVIA holds a similarly dominant position worldwide, facing no serious global

Case No.

competition. IQVIA has achieved and maintains its monopoly primarily through exclusionary contracts with Sales Data sources along with TPA obstruction and other anticompetitive tactics.

61.     Veeva has never offered a Sales Data product.

62.     The Sales Data market is global in scope. While IQVIA sells Sales Data worldwide, Sales Data is region and country specific.

63.     IQVIA sells Sales Data worldwide. Life sciences customers purchase IQVIA's Sales Data on a global basis.

64.     IQVIA has stated publicly that the Sales Data market is global. For example, IQVIA's publicly available marketing materials show that IQVIA offers its data in many countries worldwide—from Azerbaijan to Vietnam, and everywhere in between. IQVIA's Director of Information Offerings "focuses on developing, evolving and expanding IQVIA's information portfolio globally, including commercial sales and prescription data assets." And on its website, IQVIA advertises that it offers "[i]ntegrated global sales activities" data.

65.     IQVIA has also stated publicly that its "leading healthcare-specific global IT infrastructure" allows it to offer data globally. IQVIA builds its datasets about pharmaceutical consumption "to serve pharma across the globe," and IQVIA has "more than 85% coverage in global pharmaceutical sales . . . from over 100,000 suppliers worldwide."

66.     IQVIA has further stated publicly that its "pharma clients spend globally . . . well over $200 billion" on what IQVIA offers and that it is "the largest provider of these services by far across the board . . . versus [its] competitors in any of the segments that [IQVIA] compete[s] in. . . . There's no one in the world of pharma that doesn't buy something from [IQVIA]."

67.     In the alternative, Sales Data is defined by national markets, and IQVIA's anticompetitive conduct in those markets has a direct, substantial, and reasonably foreseeable effect on Veeva and in the United States.

### Life Sciences Commercial Data Warehouse (CDW) Software

68.     Raw Reference Data and Sales Data, provided in database form, are not useful in themselves. They must be paired with a suitable software platform.

69.     CDW allows life sciences companies to store and organize data, such as Reference Data and Sales Data, for use with other tools that harness and analyze data sets.

70.     Reference Data and Sales Data are CDW inputs. CDW is useless without data to host and analyze. Thus, IQVIA's monopolies in Reference Data and Sales Data give IQVIA substantial power in the CDW market. When a customer seeks to use IQVIA data with non-IQVIA CDW software, the customer must request a TPA agreement from IQVIA.

71.     The CDW geographic market is global.

72.     IQVIA and Veeva sell CDW software to life sciences companies in the United States and around the world.

73.     IQVIA's CDW is branded as IQVIA Data Warehouse. IQVIA states that IQVIA Data Warehouse provides businesses with "consistent access to mission-critical information by aggregating raw data from multiple and varied sources." IQVIA specifically markets Data Warehouse to life sciences companies.

74.     Veeva's CDW is branded as Veeva Nitro. Nitro is likewise specifically tailored to life sciences. It serves as a repository for life sciences companies' commercial data and facilitates the use of analytics, artificial intelligence, and other tools to generate key insights from that data.

75.     Due to healthcare and privacy regulations, and due to unique attributes of the life sciences industry, commercial data warehouse solutions tailored to the life sciences industry maximize value for life sciences customers.

76.     When customers buy CDW, they prefer to standardize purchases worldwide.

77.     Veeva frequently competes for global CDW contracts for large multinational life sciences companies.

78.     New CDW companies face significant barriers to entry. The CDW market is concentrated. CDW providers must expend significant resources to comply with complex regulations that vary worldwide.

COMPLAINT

Case No.

*Life Sciences Customer Relationship Management (CRM) Software*

79.     Life sciences companies use CRM software to manage their customer interactions by organizing, automating, and synchronizing data from sales, marketing, customer-database, customer-service, and technical functions. Life sciences CRM software requires Reference and Sales Data. CRM software collates data and displays it in a user-friendly manner. With these capabilities, CRM software enables companies to improve customer relationships, enhance sales effectiveness, optimize data quality, and mitigate compliance risks.

80.     Reference Data are a necessary input for the functioning of CRM software. Life sciences companies making sales calls need contact information. When a customer seeks to use IQVIA Reference Data or Sales Data with non-IQVIA CRM software, the customer must request a TPA agreement from IQVIA. IQVIA requires that its customers obtain TPAs for every use case and every country for which a third-party solution provider may receive IQVIA data, with each TPA running a distinct one-year term. As a result, the entire TPA process must be reinitiated in the event of any change or expansion of the customer's use of a software solution. For any single life sciences customer's use of any single third-party software provider, IQVIA may require numerous TPAs to document the use of IQVIA's data globally, each of which may be renewed, rejected, or changed at IQVIA's discretion annually.

81.     In contrast to IQVIA's TPA practices, Veeva has issued a master TPA to IQVIA that allows IQVIA's customers to use Veeva's data in any IQVIA application and for any IQVIA customer that IQVIA chooses to list on a simple, one-page enrollment form. Through similar agreements for software access, many IQVIA employees also have direct access to Veeva's industry-leading CRM product to provide complementary services, such as support and training, to mutual end customers.

82.     Veeva and IQVIA both compete in the global market for CRM software.

*Life Sciences Master Data Management (MDM) Software*

83.     MDM software helps life sciences companies organize information from disparate sources within their business by tracking, managing, and analyzing data to inform and support

13

decision making. MDM software accomplishes this goal by identifying data sources within a customer's business, collecting the data in a central repository, and integrating that data in a structure that facilitates consistent extraction for analysis.

84.      Life sciences companies use MDM software to integrate one dataset with another dataset, or to input datasets for software applications. For instance, if a customer were to license Reference Data from Veeva and Sales Data from IQVIA, MDM software would analyze the two different types of data and pair related data points (such as anonymized total prescription information and related Reference Data for the likely prescribing doctor). This data could be further combined with the customer's internal data, such as sales projections or manufacturing forecasts.

85.      Data are a necessary MDM input. Just as raw data has minimal utility without the tools to analyze it, MDM software is useless without data to be analyzed. IQVIA's monopolies in Reference Data and Sales Data thus give IQVIA effective control over the life sciences MDM market. As with CRM software, when the provider of the MDM software is different from the supplier of the Reference Data or Sales Data to be analyzed by the MDM software, the customer requests a TPA agreement between the data provider(s) and the MDM provider so that the data may be used by the life sciences company with the third party's MDM application.

86.      IQVIA's marketing materials predicted that, by 2018, "40% of CRM and [Enterprise Resource Planning] customers [would] demand solutions that embed master data management capabilities."

87.      Life sciences MDM software handles highly regulated data worldwide. Addressing countries' numerous and varied regulations governing the storage and handling of healthcare data, and ensuring that MDM software complies with those regulations, raises costs for life sciences MDM software developers and creates barriers that must be overcome by aspiring market entrants.

88.      Due to healthcare and privacy regulations, MDM software must be tailored specifically for life sciences customers.

89.      The life sciences MDM software geographic market is global.

14

90.     When customers buy life sciences MDM software, they prefer to standardize purchases worldwide. Although life sciences companies sometimes purchase MDM software on a country-by-country basis, life sciences companies often standardize MDM company-wide, on a global basis. Company-wide purchases often follow test runs in specific countries, making toehold positions critically important to the growth of an MDM software product.

91.     IQVIA has stated publicly that the MDM software market is global. For instance, IQVIA has stated that its "clients will deploy [its] MDM Solution globally, benefiting from [its] global implemental services, which are unmatched by [its] competitors."

92.     Veeva frequently competes for global MDM contracts for large multinational life sciences company customers.

## IQVIA'S HISTORY OF ANTICOMPETITIVE CONDUCT

93.     IQVIA has a pattern and practice of acting in bad faith to prevent life sciences companies from using, or switching to, competitor Reference Data and software solutions.

94.     IQVIA has used its dominant position in the markets for Reference Data and Sales Data to block and restrain competition, remove or reduce customer choice, raise prices, and hobble competitors through a course of anticompetitive conduct. IQVIA's own customers believe that IQVIA charges supracompetitive prices for outdated technology. IQVIA's own customers recognize that it does not innovate and that its technology is dated and overpriced. Indeed, IQVIA rarely invests in cutting-edge solutions, operating on aging legacy systems or acquiring competitors.

**Anticompetitive Conduct in Europe – Data**

95.     In 2001, European regulators intervened when IQVIA tried to block its competitors' access to key data to force them from the market. The European Commission found that IQVIA's refusal to license its industry standard Brick definitions (predefined geographical segmentations for anonymized Sales Data) to a competitor was an abuse of its dominant market position. The European Commission ordered IQVIA to license the definitions. *See* Commission Decision

15

Relating to a Proceeding Pursuant to Article 82 of the EC Treaty (EC) No. COMP D3/38.044 (July 3, 2001).

96.     Despite this censure by the European Commission, IQVIA continued its anticompetitive behavior. For instance, after IQVIA acquired SDI Health LLC (another data firm), IQVIA tried to raise the price for its data to SDI Health's rival Decision Resources Group ("DRG") from $700,000, before the acquisition, to $5,000,000 plus royalties. When DRG then tried to source its U.S. data from Symphony Health Solutions ("Symphony"), IQVIA's main Reference Data and Sales Data competitor at the time, and sought an EU-only quote from IQVIA, IQVIA responded with the same $5,000,000-plus-royalties price for the EU-only data.

97.     Although the European Commission ultimately approved the Cegedim-IQVIA merger, it mandated that IQVIA continue to make available so-called Brick definitions to prevent IQVIA from blocking competitors in the EU. *See* Commission Decision Pursuant to Article 6(1)(b) in Conjunction with Article 6(2) of Council Regulation No. 139/2004 and Article 57 of the Agreement on the European Economic Area (EC) No. COMP/M.7337 (Dec. 19, 2014).

**Anticompetitive Conduct in the United States – Symphony**

98.     In 2013, Symphony sued IQVIA in Pennsylvania federal court. *Symphony Health Solutions Corp. v. IMS Health Inc.*, 2:13-cv-04290-GAM (E.D. Pa. July 24, 2013). Symphony alleged that IQVIA had used an improper course of anticompetitive tactics to weaken and ultimately drive Symphony from the data markets. For instance, IQVIA executed long-term, exclusionary contracts with critical sources of Sales Data. These IQVIA contracts choked off Symphony's data access and eliminated Symphony's ability to compete. After more than two-and-a-half years of litigation, IQVIA chose to settle the case for an undisclosed sum of money and agreed to purchase one of Symphony's affiliates.

**Anticompetitive Conduct– Veeva Network**

99.     IQVIA's anticompetitive conduct involving the MDM market—specifically Veeva's life sciences MDM product called Veeva Network—is currently subject to litigation in the

16

District of New Jersey. *IQVIA Inc., et al. v. Veeva Systems Inc.*, Civil Action, No. 2:17-177-CCC-MF.

100.    In the New Jersey action, Veeva has asserted federal antitrust claims against IQVIA. Veeva's antitrust claims stem from IQVIA's attempt to interfere with customers' desired use of Veeva Network.

101.    To the detriment of life sciences companies, and Veeva, IQVIA exploits TPA agreements to prevent customers from loading its Reference Data and critical components of Sales Data into Veeva Network. IQVIA has thus blocked life sciences companies across the globe from using Veeva Network with its monopoly data products.

102.    In its attempt to maintain its Reference Data monopoly, IQVIA also hinders customers who attempt to switch from IQVIA's Reference Data (OneKey) to Veeva's Reference Data (OpenData). A customer switching Reference Data providers must ensure that its own records linked to its Reference Data set are not lost. The customer thus needs to "match," as much as possible, each record in the prior data set to each corresponding record in the new Reference Data set. Setting aside two anomalous exceptions (both outside of the United States and EU), IQVIA has categorically refused to allow mapping of its Reference Data to Veeva Reference Data.

103.    IQVIA's anticompetitive tactics have coerced customers to continue to license only IQVIA Reference Data. By denying customers the ability to map their own data records to a new Reference Data set, IQVIA prevents customers from migrating away from IQVIA's monopoly data without incurring severe switching costs.

104.    The U.S. District Court for the District of New Jersey denied IQVIA's motion to dismiss Veeva's Counterclaims[1] and the parties have engaged in substantial discovery. Veeva filed its First Amended Answer & Counterclaims on December 3, 2018. Fact discovery is scheduled to close on September 17, 2019.

---

[1] *IQVIA Inc. v. Veeva Sys. Inc.*, No. CV 17-00177 (CCC), 2018 WL 4815547 (D.N.J. Oct. 3, 2018).

17

**ANTICOMPETITIVE CONDUCT – CDW**

**IQVIA Abuses the TPA Process to Slow and Block Veeva Nitro**

105.    In mid-2018, Veeva launched a CDW product called Nitro. CDW solutions store and organize data, such as Reference Data and Sales Data, for use with other tools that harness and analyze datasets. As explained, IQVIA is a monopolist with market power in Reference Data and Sales Data.

106.    Nitro is a next-generation CDW that eliminates the time and effort of custom commercial data warehouse development and maintenance. Nitro uses industry-specific data model and standard data connectors. Nitro thus enables life sciences companies to seamlessly unify their most important data sources. Customers can also use Nitro in conjunction with artificial intelligence tools.

107.    IQVIA offers its own CDW solution called IQVIA Data Warehouse. Upon information and belief, IQVIA has mobilized a dedicated sales force to market IQVIA Data Warehouse in direct competition with Nitro.

108.    IQVIA recognized the competitive threat that Veeva Nitro posed. IQVIA responded by exploiting its monopolies in Reference Data and Sales Data to cripple Veeva's ability to sell Nitro. IQVIA refused to allow customers to load IQVIA Reference Data and Sales Data into Nitro. This refusal stymied Nitro's viability in the CDW market. IQVIA knew that its tactics would succeed because it had already deployed them in the life sciences MDM software market to block Veeva Network. In addition to hobbling Veeva's competitive Nitro software, IQVIA's tactics ensure its continued stranglehold on Reference Data.

109.    In September 2018, one of Veeva's first Nitro customers submitted a TPA request to use IQVIA Sales Data with Nitro. IQVIA initially refused the request and later blocked NPI numbers and other publicly available identifiers.

110.    Also in September 2018, another major pharmaceutical customer requested a TPA to use IQVIA Reference Data with Veeva Nitro. Although the customer provided detailed information to IQVIA regarding the request, and despite the customer's repeated efforts to elicit a

18

response, IQVIA delayed for weeks without providing any meaningful feedback. As of the filing of this complaint, IQVIA has stopped responding to the customer's TPA request.

111.    IQVIA engaged in the same course of conduct with respect to another customer who sought to use IQVIA Reference Data and Sales Data with Nitro beginning in September 2018. These represent two of at least four customers who were directly frustrated in their attempts to secure TPA agreements for use of IQVIA data in Veeva Nitro.

112.    IQVIA has not granted any TPA requests to use its Reference Data in Veeva Nitro.

113.    IQVIA has approved only two Nitro TPAs, and with only restricted IQVIA Sales Data attributes. IQVIA withheld key Sales Data attributes like NPI numbers from both TPAs.

114.    Those two restricted Nitro TPAs aside, IQVIA has delayed and encumbered customers' ability to use any IQVIA Reference Data or Sales Data in Veeva Nitro.

115.    IQVIA claims it is delaying the Nitro TPA process to "improve its understanding of Veeva Nitro" and to "ensure that its intellectual property will remain secure in Veeva Nitro." Yet from the outset, Veeva has addressed each of IQVIA's purported Nitro "concerns" clearly and comprehensively. Veeva has offered well-supported assurances that Nitro is equipped to safeguard IQVIA's intellectual property. Yet IQVIA continues to deny its customers the ability to use IQVIA Reference Data and Sales Data in Veeva Nitro by delaying and obstructing the Nitro TPA process.

116.    For example, in September 2018, one major life sciences company requested a TPA to use IQVIA Reference Data and Sales Data in Nitro. IQVIA responded with questions regarding Nitro, including:

      a.   Whether the customer sought to use Nitro to compare IQVIA data with non-IQVIA data;

      b.   How Nitro separates IQVIA's intellectual property from Veeva's, and prevents Veeva personnel from accessing IQVIA's intellectual property;

      c.   How Veeva trains Nitro employees to protect IQVIA intellectual property; and

COMPLAINT

d.  Whether Nitro has controls and auditing functions designed to safeguard IQVIA intellectual property.

117.  Veeva, promptly and comprehensively, answered IQVIA's questions:

a.  The customer may use Nitro to analyze IQVIA data alongside non-IQVIA data for analytics purposes, but Nitro does not merge or otherwise integrate data from various sources to create new records.

b.  Nitro has a "single-tenant architecture," meaning that each customer can access only its own data (in single-customer "instances" or "tenants"). Nitro does not share data among customers, vendors, and third parties. This single-tenant architecture precludes unauthorized commingling of IQVIA's intellectual property with Veeva's, and prevents nonsubscribers from accessing IQVIA's intellectual property. Furthermore, Veeva Nitro personnel who may access IQVIA data for configuration and implementation purposes are strictly prohibited from developing, selling, or marketing Veeva OpenData. Likewise, Veeva OpenData personnel are strictly prohibited from accessing IQVIA data in Nitro. Those policies are documented in Veeva OpenData Privacy Operations Process, which Veeva had already shared with IQVIA, and which details restrictions on Veeva personnel in handling IQVIA data.

c.  Veeva employees receive privacy and security training tailored to their role. This training covers data access rights, data retention, and security controls. Veeva routinely instructs employees that third-party data (including IQVIA data) is sensitive, protected, and accessible only for the purpose of providing an authorized service to a customer, and only by authorized personnel. Veeva strictly

20

1    prohibits employees from using third-party data to improve or

2    enhance Veeva OpenData.

3         d.   Veeva maintains Nitro access logs. These logs reveal who has

4              accessed which customer's Nitro instance and on which date.

5              IQVIA can review Nitro access logs to ensure TPA compliance.

6    118.   Despite Veeva's clear and thorough responses, backed by documentation and

7    extensive prior dialogue, IQVIA delayed its TPA decision for months, stringing Veeva and its

8    customers along. In dynamic and highly competitive life sciences markets, delay is akin to denial.

9    119.   After months of delay, which left Veeva and its customers suspended in uncertainty,

10   IQVIA insisted that Veeva police customers' use of IQVIA data. IQVIA pressured Veeva to ensure

11   that life sciences companies that license IQVIA data do not misuse that data by, for instance,

12   permitting unauthorized third parties to access it.

13   120.   Policing customers' use of IQVIA data would be difficult or impossible for Veeva.

14   It would also be unnecessary. TPAs bind customers as well as third-party vendors like Veeva.

15   Customers must monitor their own data use and, if they share IQVIA data with unauthorized users

16   (through no fault of Veeva's), license agreements and TPAs already hold customers accountable,

17   protecting IQVIA's intellectual property.

18   121.   IQVIA's attempt to conscript Veeva to police third-party use of IQVIA data is the

19   latest of IQVIA's brazen attempts to exercise of market power in Reference Data and Sales Data.

20   122.   IQVIA tries to justify its delay by claiming that it needs time to verify that Nitro

21   protects IQVIA intellectual property. That explanation is pretextual. IQVIA offers its own CDW

22   product and understands how CDW software functions. IQVIA also knows Nitro poses no IP threat

23   to IQVIA data, as IQVIA has permitted two customers to use Sales Data in Nitro (albeit with

24   substantial restrictions). Moreover, whenever IQVIA has inquired into Nitro's specifications,

25   functionality, and IP safeguards, Veeva has given comprehensive, specific responses.

26   123.   Veeva has bent over backward, expending substantial time and effort, to address

27   IQVIA's questions and concerns regarding Nitro. Yet IQVIA continues to withhold its monopoly

28

COMPLAINT

Case No.

Reference Data and Sales Data. IQVIA's abuse of the TPA process is particularly problematic because IQVIA Reference Data and Sales Data are deeply embedded in customer systems. Few alternatives exist, and switching Reference Data and Sales Data is costly and burdensome for the customer. When IQVIA refuses to permit its Reference Data and Sales Data to be used in Nitro, the effect is to steer customers away from Nitro, harming competition in the CDW market.

124.    IQVIA's real objective is to prevent its customers from using competitive data products and software applications. IQVIA's anticompetitive acts in markets adjacent to CDW software further illustrate the pretextual nature of its "data security" concerns.

125.    For example, since Veeva's founding through the present day, Veeva and IQVIA have signed TPA agreements allowing life sciences companies to use IQVIA Reference Data and Sales Data with Veeva CRM. As IQVIA knows, Veeva CRM has substantially the same security protections as Veeva Nitro. IQVIA has continued allowing the same data to be used with Veeva CRM because Veeva CRM is popular among IQVIA's customers, whereas Veeva Nitro is a newer product. Veeva Nitro is thus more vulnerable to IQVIA's anticompetitive tactics.

126.    In another example, IQVIA permits its Sales Data to be used in Veeva Network (albeit with substantial restrictions). But with respect to Nitro, aside from the two TPAs IQVIA has approved, IQVIA has prohibited customers from using *any* Sales Data.

127.    No matter how exhaustively Veeva addresses IQVIA's "concerns" regarding Nitro, IQVIA has shown no willingness to execute Nitro TPAs. IQVIA instead seeks only to make the TPA process as cumbersome as possible. Regardless of Veeva's efforts undertaken and costs incurred, IQVIA has refused to negotiate in good faith or provide nonpretextual explanations for its intransigence.

128.    IQVIA's insistence on encumbering the TPA process has left customers suspended in uncertainty, hindering their business operations. IQVIA has thus stunted competition in the CDW market by precluding life sciences companies around the world from using Veeva Nitro.

Case No.

129.    Upon information and belief, IQVIA has not imposed the same restrictions on customers that build their own CDW products using the same underlying technology (Amazon Redshift) that Veeva uses for Nitro.

130.    By conditioning the sale of its data products on the acceptance of a restrictive license that requires TPAs, and then denying TPAs, IQVIA has prevented customers from using their preferred CDW software and thereby foreclosed a threat to IQVIA's data monopolies. IQVIA effectively forces customers who use IQVIA's monopoly Reference Data and Sales Data to avoid Veeva products. If customers were free to use their preferred CDW with IQVIA's data, they would face lower switching costs if they later chose to change data providers.

131.    IQVIA's abuse of the TPA process has prevented Veeva from expanding in the CDW market and insulated IQVIA's data businesses from a potential challenger. IQVIA recognizes that unless it blocks Veeva in the CDW software market, Veeva will be able to offer superior pricing and quality to customers in both the CDW and Reference Data markets.

**Denials of National Provider Numbers**

132.    In the second half of 2016, IQVIA stopped allowing National Provider Identifier ("NPI") numbers from Sales Data to be used with Veeva's MDM software, Veeva Network. Likewise, for the only two TPA requests it granted for customers to use Sales Data in Nitro, IQVIA blocked the customers from using NPI numbers and other publicly available identifiers in Nitro.

133.    NPI numbers are part of the Health Insurance Portability and Accountability Act ("HIPAA") standard, and are government-issued unique identifiers for all health care providers in the United States. A federal government agency, the Centers for Medicare & Medicaid Services (CMS), distributes NPI data publicly online at http://download.cms.gov/nppes/NPI_Files.html. Because NPI numbers are universal and unique, they are especially valuable in pairing datasets.

134.    Although NPI numbers are created by the government and their use is mandated by statute, IQVIA claims that NPI numbers are IQVIA intellectual property and "premium" attributes of IQVIA data that cannot be used with Veeva's MDM or CDW solutions. IQVIA knows that these claims are baseless.

Case No.

135.    IQVIA's exploitation of TPAs to withhold NPI numbers harms customers, and Veeva. Customers use MDM to match Reference Data records to Sales Data records, which they then store in their CDW. Doing so enables customers to achieve a comprehensive view of healthcare professionals and healthcare organizations, encompassing both Reference Data elements (such as contact information and areas of expertise) and Sales Data elements (such as sales or prescriptions). Matching Reference Data to Sales Data requires use of a common, unique identifier, such as an NPI number. IQVIA uses TPAs to withhold NPI and other key identifiers from Veeva Network and Veeva Nitro, thereby obstructing matching and diminishing the value that Veeva OpenData, Veeva Network, and Veeva Nitro offer customers. Since IQVIA dominates the global Sales Data market, customers must look elsewhere for Reference Data, MDM, and CDW, or derive fewer benefits from Veeva products.

**Denials of "Brick" Data**

136.    In a similar pattern, starting in 2016, IQVIA has delayed signing TPA agreements allowing its Brick definitions to be loaded into Veeva Network, as it did with one top five pharmaceutical company which subscribes to Veeva's Reference Data, CRM, and Veeva Network. Because Brick definitions change regularly and IQVIA requires a new TPA for each update, each IQVIA delay in signing compounds customer harm by raising contracting costs and impeding customer data use. Although the European Commission required IQVIA to provide the Brick definition to software providers upon customer request, that requirement is useless if IQVIA provides only outdated data.

137.    With another major pharmaceutical customer that used Veeva OpenData, IQVIA stated in November 2016 that it would not allow Brick data into Veeva CRM or Network, stating that being able to do so is "the benefit of staying on OneKey." When the customer responded that such requests had been approved by IQVIA in other countries and was compelled by the European Commission decision approving the IQVIA-Cegedim merger, IQVIA stopped responding.

Case No.

138.    By delaying each TPA agreement allowing the use of Brick definitions in Veeva MDM, IQVIA is deliberately skirting the intent of the European Commission decision and abusing its monopoly over those definitions to prevent customers from using competing MDM solutions.

139.    IQVIA's behavior in delaying Brick data approval for use in Veeva MDM is pretextual because it diverges from the behavior of similarly situated competitors. For instance, GERS France, a former Cegedim entity not acquired in the merger, regularly grants TPA agreements to customers for general use of Veeva's software products, without excluding Veeva's MDM or CDW, and without the requirement of a new TPA for each definition update.

140.    Because of IQVIA's Sales Data monopoly, customers that switch from IQVIA Reference Data to Veeva Reference Data typically continue to purchase IQVIA Sales Data. As a result, customers generally must match and merge their own records, records in Veeva Reference Data, and records in IQVIA Sales Data.

141.    By refusing to grant either a TPA to allow full data matching, or to allow NPI numbers or regular Brick definition updates into Veeva's systems, IQVIA substantially hinders Veeva's ability to help customers switch to Veeva Reference Data or MDM, or match Veeva Reference Data with IQVIA Sales Data. Customers are forced to rely on imprecise matching techniques—the result being that customers pay higher costs for lower quality.

**Threats of Retaliation**

142.    IQVIA threatens customers that seek to switch to competing products. For instance, IQVIA has deterred customers from switching to Veeva products by emphasizing the costs and burdens that switching imposes on customers. Of course, switching products is not inherently costly or burdensome. IQVIA makes it so through TPA restrictions, and leverages its TPA discretion to discourage switching and distort competition. Due to IQVIA's market power in Reference Data and Sales Data, customers often capitulate to IQVIA's threats. Consequently, life sciences companies are reluctant to switch to competing products even when IQVIA's products are inferior or more expensive.

143.    Due to IQVIA's market power in Reference Data and Sales Data, even large companies fear angering IQVIA by switching away from its products. Major life sciences companies have expressed reluctance to switch away from IQVIA products for fear of retaliation.

144.    Upon information and belief, these fears are inspired and encouraged by IQVIA sales teams. IQVIA routinely conveys to customers that, should they switch, they will face prohibitive, IQVIA-imposed costs and burdens. IQVIA communicates these burdens as an implicit threat to customers to deter switching to competitors.

**ANTICOMPETITIVE CONDUCT – CRM**

145.    Beginning in mid-2019, Veeva launched Veeva Andi, an artificial intelligence application that embeds tailored insights and suggestions in Veeva CRM.

146.    Veeva Andi is a next-generation application designed to integrate with Veeva CRM. Together, Andi and Veeva CRM make it easy for life sciences companies to adopt, deploy, and scale artificial intelligence across Veeva CRM. Andi works with Veeva CRM to give life sciences customers the power to drive intelligent engagement through real-time insights and suggestions to understand a customer's preferences and identify next-best actions, channels, and content. Andi enables Veeva CRM to harness and analyze datasets using artificial intelligence.

147.    Veeva Andi is currently available in the United States but will soon be available in other markets.

148.    IQVIA offers its own artificial intelligence solution called Ada. Upon information and belief, IQVIA has mobilized a dedicated sales force to market IQVIA's Ada in direct competition with Veeva's Andi.

149.    Following the introduction of Veeva's Andi, upon information and belief, IQVIA began a campaign to abuse its monopoly position in Reference Data and Sales Data to hinder Veeva's ability to successfully sell Andi to life sciences companies. IQVIA understood that by blocking customers from using this critical resource with Andi, it could effectively limit Veeva's ability to sell Andi to life sciences companies. By preventing customers from using artificial intelligence with Veeva CRM, IQVIA would stifle Veeva as a competitor in the CRM market.

IQVIA could thus maintain and enhance its dominant position in the Reference Data and Sales Data markets.

150.    In 2019, a major life sciences company requested a TPA agreement to use IQVIA data with Veeva's Andi tool as a pilot project. IQVIA refused the request, and upon information and belief, told the life sciences company that it is not approving TPAs for data to be used with Andi.

151.    On information and belief, IQVIA has signed TPAs allowing customers to use other artificial intelligence providers. IQVIA has singled out Veeva for anticompetitive treatment.

152.    IQVIA has not granted any TPA requests to use IQVIA's data products with Veeva's Andi. IQVIA's anticompetitive use of the TPA process has prevented customers from using their preferred artificial intelligence provider and injured customers' business operations. IQVIA's delay and denial of TPA requests has also limited competition in the life sciences artificial intelligence market. Many life sciences companies around the world are unable to use Veeva's artificial intelligence solution as a result of IQVIA's refusal to enter into TPA agreements.

153.    IQVIA's actions have prevented Veeva from expanding into the artificial intelligence market and insulated IQVIA's data business from a potential challenger.

### INJURY TO COMPETITION

154.    To date, IQVIA's illegal conduct has directly harmed competition in multiple ways.

155.    By refusing to sign TPA agreements allowing the use of IQVIA Reference Data in Veeva Nitro and Veeva Andi, IQVIA has impeded Veeva's ability to compete in those markets and interfered with multiple life sciences companies' decisions to purchase Veeva's superior software products. IQVIA forces life sciences companies to use inferior and/or more expensive solutions. Customers thus suffer inefficiencies and other business harms.

156.    IQVIA's anticompetitive conduct has harmed competition by reducing customer choice and increasing prices in the CDW, Reference Data, and life sciences artificial intelligence markets. Through its various other anticompetitive activities and tactics, IQVIA has discouraged other competitors from providing competing Reference Data, Sales Data, CDW, and life sciences

27

Case No.

artificial intelligence solutions. IQVIA has thus reduced the quality of the available solutions in each market and effectively raised costs.

157.    By refusing to sign TPA agreements allowing NPI and other "premium attributes" to be loaded into Veeva Nitro, IQVIA has harmed competition in the CDW market by restricting customers' choices and increasing prices of CDW and Reference Data.

158.    IQVIA's anticompetitive conduct has substantially increased the cost and difficulty of life sciences companies seeking to change data suppliers from IQVIA to Veeva. This has directly increased the costs and time needed for life sciences companies to undertake such transitions, harming business operations. Customers are thus forced into using IQVIA Reference Data and CDW other than Veeva Nitro. The effect has been to cement IQVIA's Reference Data monopoly and to create a dangerous probability that IQVIA will monopolize CDW.

## FIRST CLAIM FOR RELIEF

### Attempted Monopolization – Life Sciences Data Warehouse Software (15 U.S.C. § 2)

159.    Plaintiff repeats and realleges paragraphs 1–158.

160.    IQVIA has unlawfully attempted to monopolize the worldwide CDW market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

161.    IQVIA maintains market power in the related Reference Data and Sales Data markets.

162.    IQVIA markets a CDW product called IQVIA Data Warehouse. IQVIA intends to monopolize the CDW market. IQVIA's specific intent to monopolize is apparent from its anticompetitive conduct that lacks any legitimate business justification. IQVIA has specifically sought to block customers from using IQVIA Reference Data or Sales Data in or with Veeva's CDW, Veeva Nitro, and to cut off Veeva's ability to provide CDW by other means.

163.    IQVIA has a dangerous probability of achieving monopoly power in the worldwide CDW market. Most importantly, IQVIA is using its market power in the related Reference Data and Sales Data markets to block Veeva from competing in the CDW market. Moreover, the worldwide life sciences CDW software market is concentrated, and potential new entrants to the

28

Case No.

market face extensive technological and regulatory compliance requirements and high capital costs, among other barriers to entry. Through its attempted monopolization of the worldwide CDW market, IQVIA has harmed competition.

164.    As a direct and proximate result of IQVIA's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of higher prices, inferior products, and fewer choices. Veeva is entitled to damages for the violations of the Sherman Act alleged herein.

## SECOND CLAIM FOR RELIEF

### Monopoly Maintenance – Reference Data (15 U.S.C. § 2)

165.    Plaintiff repeats and realleges paragraphs 1–158.

166.    As evidenced by its overt, anticompetitive, and predatory acts as alleged herein, IQVIA has engaged in an anticompetitive scheme to effectuate, maintain, and enhance its monopoly power in the global Reference Data market.

167.    IQVIA has thus violated Section 2 of the Sherman Act, 15 U.S.C. § 2. IQVIA has willfully acquired or maintained market power in the relevant market. This market power is protected by high switching costs and high barriers to competitive entry and expansion.

168.    IQVIA's artificial creation of barriers and other conduct enhancing competitive exclusion have unlawfully excluded and suppressed competition.

169.    Reference Data and CDW are highly complementary products, and life sciences companies prefer to purchase Reference Data and CDW from a single vendor. IQVIA exploits the TPA process to steer customers away from Veeva's CDW product, Veeva Nitro. In turn, IQVIA's conduct discourages life sciences companies from adopting complementary Veeva products, including Veeva's Reference Data product, OpenData.

170.    IQVIA specifically intends to maintain its monopoly in global Reference Data by diluting the value customers can derive from its only competing global product, Veeva OpenData.

Case No.

171.    As a direct and proximate result of IQVIA's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of higher prices, inferior products, and fewer choices. Veeva is entitled to damages for the violations of the Sherman Act alleged herein.

### THIRD CLAIM FOR RELIEF

### Tying (15 U.S.C. §§ 1, 2)

172.    Plaintiff repeats and realleges paragraphs 1–158.

173.    A tying arrangement is an agreement by a party to sell one product (the "tying product") on the condition that the buyer also purchases another product or agrees not to purchase another product from other sellers (the "tied product"). Tying arrangements violate §§ 1 and 2 of the Sherman Act if the seller has market power in the tying product market and if the arrangement affects substantial commerce in the tied product market.

174.    IQVIA has market power in global Reference Data and Sales Data. IQVIA harnesses that market power by selling Reference Data and Sales Data (the tying products) to customers only on the condition that they do not use it with Veeva's CDW (the tied product).

175.    By withholding its Reference Data and Sales Data from Veeva Nitro, IQVIA conditions the use of its Reference Data and Sales Data on customers' forbearance from Veeva's CDW.

176.    Through its exploitation of its monopoly power in Reference Data and Sales Data, IQVIA has substantially harmed competition in the CDW market.

177.    As a direct and proximate result of IQVIA's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of higher prices, inferior products, and fewer choices. Veeva is entitled to damages for the violations of the Sherman Act alleged herein.

### FOURTH CLAIM FOR RELIEF

### Exclusive Dealing (15 U.S.C. §§ 2, 14)

178.    Plaintiff repeats and realleges paragraphs 1–158.

COMPLAINT

Case No.

179.     If a contract's practical effect is to prevent buyers from using the goods of the seller's competitor, thereby foreclosing substantial competition, the contract constitutes unlawful exclusive dealing in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, and § 3 of the Clayton Act, 15 U.S.C. § 14.

180.     The effect of IQVIA's TPA policy is to bar customers from using the goods of its competitor—namely Veeva's CDW.

181.     By exploiting its market power through its TPA policy and inhibiting customers' freedom to deal with vendors of their choice, IQVIA stifles competition in the CDW market.

182.     As a direct and proximate result of IQVIA's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of higher prices, inferior products, and fewer choices. Veeva is entitled to damages for the violations of the Sherman and Clayton Acts alleged herein.

### FIFTH CLAIM FOR RELIEF

### Monopoly Leveraging of Reference and Sales Data (15 U.S.C. § 2)

183.     Plaintiff repeats and realleges paragraphs 1–158.

184.     IQVIA has unlawfully leveraged its monopoly power in global Reference Data and Sales Data to obtain market power in the global CDW market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

185.     IQVIA has abused its monopoly power by blocking customers from using its Reference Data and Sales Data in Veeva Nitro and, in so doing, steered customers from Veeva Nitro.

186.     As a result of IQVIA's abuse of monopoly power, IQVIA has a dangerous probability of monopolizing the global CDW market. The global CDW market is concentrated, and potential market entrants face pervasive technological and regulatory-compliance requirements, along with high capital costs. The concentration of the CDW market, coupled with IQVIA's control over indispensable CDW inputs like Reference Data and Sales Data, render the global CDW market vulnerable to monopolization by IQVIA.

31

187.    Through its leveraging of monopoly power in global Reference Data and Sales Data, IQVIA has harmed competition in the global CDW market.

188.    As a direct and proximate result of IQVIA's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of higher prices, inferior products, and fewer choices. Veeva is entitled to damages for the Sherman Act violations alleged herein.

32

### SIXTH CLAIM FOR RELIEF

**Intentional Interference with Contractual Relations**

189.    Plaintiff repeats and realleges paragraphs 1–158.

190.    Veeva and multiple major life sciences companies were in ongoing contractual relations that would have benefitted Veeva.

191.    IQVIA knew of these contracts.

192.    IQVIA intended to disrupt these contracts by negotiating TPA agreements in bad faith and refusing to execute them without valid reasons, in an attempt to monopolize the software market.

193.    Veeva was harmed by losing millions in revenue that would have flowed from those contracts.

194.    IQVIA's conduct was a substantial factor in these losses.

195.    As a direct and proximate result of IQVIA's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of higher prices, inferior products, and fewer choices. Veeva is entitled to damages for the violations alleged herein.

### SEVENTH CLAIM FOR RELIEF

**Intentional Interference with Prospective Economic Advantage**

196.    Plaintiff repeats and realleges paragraphs 1–158.

197.    Veeva and multiple major life sciences companies were in ongoing contractual relations that would have benefitted Veeva.

198.    IQVIA knew of these contracts.

199.    IQVIA engaged in intentional wrongful conduct through leveraging its monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

200.    IQVIA engaged in wrongful conduct by breaching the covenant of good faith and fair dealing with its customers by rejecting or delaying customer TPA requests for the purpose of interfering with Veeva's prospective business relations with those customers.

33

Case No.

201.    The relationships were disrupted because the companies did not purchase Veeva Nitro.

202.    Veeva was harmed by the companies declining to purchase Veeva Nitro, Veeva's CDW product. IQVIA's conduct was a substantial factor in Veeva's harm.

203.    As a direct and proximate result of IQVIA's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of higher prices, inferior products, and fewer choices. Veeva is entitled to damages for the violations alleged herein.

## EIGHTH CLAIM FOR RELIEF

### Violation of the Cartwright Act (Cal. Bus. & Prof. Code § 16700, *et seq.*)

204.    Plaintiff repeats and realleges paragraphs 1–158.

205.    IQVIA engaged in an unreasonable restraint of trade in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., for all the reasons set forth in the preceding allegations. IQVIA's conduct is an unreasonable and unlawful restraint of trade and commerce.

206.    As a direct and proximate result of IQVIA's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of higher prices, inferior products, and fewer choices. Veeva is entitled to damages for the violations of the Cartwright Act alleged herein.

## NINTH CLAIM FOR RELIEF

### Violation of the Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*)

207.    Plaintiff repeats and realleges paragraphs 1–158.

208.    The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq., defines "unfair competition" to include any "unlawful, unfair or fraudulent business act or practice."

209.    IQVIA has engaged in "unlawful" business acts and practices as alleged herein in violation of, among other laws, Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; the Cartwright Act, Cal. Bus. & Prof. Code § 16720; and California common law, including the torts of interference with contract, prospective economic advantage, and negligent misrepresentation.

34

Case No.

210. IQVIA's acts and practices as alleged herein have also been "unfair" under the UCL. IQVIA's conduct has violated the antitrust laws (namely, the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Cartwright Act, Cal. Bus. & Prof. Code § 16720), violated the policy and spirit of those laws (resulting in an effect comparable to an antitrust violation), and significantly threatened and harmed competition in the CDW market. Furthermore, any utility from IQVIA's conduct does not outweigh the harm it causes to competitors and life sciences companies.

211. A substantial portion of the unlawful and unfair acts and practices alleged herein occurred in California and the harm to Veeva and many life sciences customers was inflicted in California, for all the reasons set forth in the preceding allegations.

212. As a direct and proximate result of IQVIA's unlawful and unfair conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of higher prices, inferior products, and fewer choices. Veeva is entitled to injunctive relief and restitution in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor and enter an order:

    A. Permanently enjoining Defendants and their agents and employees to cease TPA denials, delay, and other abuse, and to enter into TPAs with Veeva under which customers may use IQVIA Reference Data and Sales Data with Veeva Nitro, just like IQVIA has done with respect to Veeva CRM and other third-party CDW applications;

    B. Awarding Plaintiff damages, including its actual current and prospective damages for Defendants' violation of state and federal antitrust laws, which are in excess of $200 million;

    C. Awarding Plaintiff punitive damages for Defendants' Intentional Interference with Contractual Relations and Intentional Interference with Prospective Economic Advantage and the California UCL;

Case No.

D.  Awarding Plaintiff costs of suit, including reasonable attorneys' fees;

E. Awarding pre-judgment and post-judgment interest at the highest rate allowed by law; and

F. Awarding such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: July 18, 2019                                      Respectfully submitted,


By:  ___/s/ *Oleg Elkhunovich*_____

Oleg Elkhunovich (269238)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Telephone: (310) 789-3193
Facsimile: (310) 789-3150
oelkhunovich@susmangodfrey.com

James T. Southwick (pro hac vice to be filed)
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Facsimile:  (713) 654-6666
jsouthwick@susmangodfrey.com

Steven F. Benz (pro hac vice to be filed)
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
sbenz@kelloghansen.com

36

COMPLAINT